IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

JOHN T. HARDEE,

    Plaintiff,

        v.                                 Civil Action No. 3:20cv729

CHRISTOPHER WALZ, *et al.*,

    Defendants.

## MEMORANDUM OPINION

John T. Hardee, a Virginia inmate proceeding *pro se* and *in forma pauperis*, filed this 42 U.S.C. § 1983 action.[1]  The matter is proceeding on Hardee's Third Amended Complaint.[2]  (ECF No. 117.)  Hardee's claims stem from his infection with COVID-19 while incarcerated in the Hampton Road Regional Jail ("HRRJ").  Hardee named the following individuals and entities in the Third Amended Complaint:  Superintendent Christopher Walz; Assistant Superintendent Felicia Cowan; Captain Winston Bhagirath; Sergeant Mary Cheeseboro; Sergeant T. Jones; Officer Matthew Tillman; Officer Clark; the Virginia Department of Corrections ("VDOC");

---

[1] That statute provides, in pertinent part:

> Every person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.

[2] The Court corrects the capitalization, punctuation, and spelling in the quotations from the parties' submissions.  The Court omits any secondary citations from the parties' submissions. The Court employs the pagination assigned by the CM/ECF docketing system.

Harold Clarke, the Director of the VDOC; "Correct Care Solutions and its other name, Well Path"; Nurse Kathryn Topham; and Nurse Practitioner Jennifer Hodge. (ECF No. 117, at 1.) The matter is before the Court on the Motion to Dismiss filed by Defendants Clarke and the VDOC and the Motions for Summary Judgment filed by the remaining Defendants. All Defendants provided Hardee with appropriate *Roseboro* notice. (ECF Nos. 120, 131, 140, 150.)[3] Hardee has responded. (*See, e.g.*, ECF Nos. 125, 137–39, 142, 143, 145, 146, 155, 158, 160.)

For the reasons set forth below, the Motion to Dismiss (ECF No. 118) and the Motions for Summary Judgment (ECF Nos. 127, 133, 148) will be GRANTED. Hardee's constitutional claims will be DISMISSED WITH PREJUDICE. Hardee's state law claims will be DISMISSED WITHOUT PREJUDICE.

## I. Pertinent Procedural History

Hardee initially filed this action with numerous other inmates at HRRJ. (ECF No. 1, at 1.) Hardee purported to bring the suit as a class action. (ECF No. 1, at 1.) By Memorandum Order entered on October 16, 2020, the Court informed Hardee and the other inmate plaintiffs that the action could not proceed as a class action. (ECF No. 5, at 2–4.) In the ensuing months, the Court dismissed the majority of plaintiffs because they failed to comply with the directions of the Court. (*See, e.g.*, ECF Nos. 16, 17.) By Memorandum Order entered on March 23, 2021, the Court ordered that this action would proceed with Hardee as the sole plaintiff. (ECF No. 21, at

---

[3] By Memorandum Order entered on May 1, 2023, the Court converted the Motion to Dismiss filed by Defendants Correct Care Solutions, Hodge, and Topham into a Motion for Summary Judgment. (ECF No. 140.) That same Memorandum Order granted Hardee an additional twenty (20) days to file any further materials in opposition to the newly converted Motion for Summary Judgment.

4.)  By Memorandum Opinion and Order entered on March 10, 2023, the Court granted Hardee's

Motion to Amend and filed his Third Amended Complaint.  (ECF Nos. 115, 116.)

## II.  The Third Amended Complaint

### A.    Allegations in the Third Amended Complaint

Hardee's Third Amended Complaint concerns his infection with COVID-19 while

detained in HRRJ.  In March of 2018, Hardee was incarcerated in HRRJ as a pretrial detainee.

(ECF No. 117 ¶ 5.)  On March 17, 2020, Hardee read a newspaper article wherein Christopher

Walz, the Superintendent of HRRJ represented that "[h]is staff is also screening inmates who

leave for court.  If someone develops flu-like symptoms, the jail has special 'negative pressure'

rooms available to quarantine."  (ECF No. 117 ¶ 5. (alteration in original).)  Hardee's cellmate,

however, had gone to court on two consecutive dates and had not been screened.  (ECF No. 117

¶ 5.)  Hardee wrote a petition to public officials, including Superintendent Walz, wherein he

"asked for the suspension of new admits, and for bonds, and that convicted prisoners be picked

up by" the VDOC.  (ECF No. 117 ¶ 6.)  Numerous inmates signed Hardee's petition.  (ECF No.

117 ¶ 5.)

On April 2, 2020, Hardee and his three cellmates were moved from cell 2-1-B-109,

upstairs to cell 2-B-210 by Officer Clark.  (ECF No. 117 ¶ 7.)  Later that day, Officer Clark and

Sergeant Cheeseboro directed the inmates in Hardee's cell block to briefly lockdown.  (ECF No.

117 ¶ 7.)  Thereafter, the correctional officers moved some inmates into 2-1-B-209, which was

near Hardee's new cell.  (ECF No. 117 ¶¶ 7, 8.)  After the newly arrived inmates were placed in

their cell, the other inmates on the block were released from lockdown.  (ECF No. 117 ¶ 7.)

Hardee later learned that the newly arrived inmates "were new intakes placed in 'medical

observation.'"  (ECF No. 117 ¶ 7.)  The inmates on the block were angry because they were

3

"being forced to share the same poor ventilation system with these new intakes." (ECF No. 117 ¶ 7.) Sergeant T. Jones, Sergeant Cheeseboro, and Officer Clark "had no answers." (ECF No. 117 ¶ 8.) Hardee and his cellmates had to share the same utility closet with the newly arrived inmates. (ECF No. 117 ¶ 8.)

On April 7, 2020, Hardee was escorted from his cell to a conference room. (ECF No. 117 ¶ 9.) Superintendent Walz, Assistant Superintendent Cowan, and Captain Bhagirath were present. (ECF No. 117 ¶ 9.) With respect to Hardee's petition, Superintendent Walz stated, "I believe that there might be some miscommunication as to the meaning of 'screening.'" (ECF No. 117 ¶ 10.) Hardee then explained how his cellmate had gone to court and returned without being screened. (ECF No. 117 ¶ 10.) "Walz and Bhagirath looked confused and unaware. Bhagirath said, 'I'll investigate as to why this happened.'" (ECF No. 117 ¶ 10.) Hardee then voiced his displeasure with having the newly arrived inmates "being 'medically observed' in general population." (ECF No. 117 ¶ 10.) Walz, Cowan, Bhagirath assured Hardee that, if the newly arrived inmates showed any symptoms of COVID-19, they would be moved to the negative pressure cells. (ECF No. 117 ¶ 11.)

On April 9, 2020, Bhagirath and Cowan came and spoke to Hardee and other inmates. (ECF No. 117 ¶ 12.) Hardee asked them when the inmates would get masks, because they knew the Governor had approved 2 million dollars to purchase personal protective equipment ("P.P.E."). (ECF No. 117 ¶ 12.) Cowan stated, "We've applied for P.P.E., so we will see." (ECF No. 117 ¶ 12.)

Although the newly arrived inmates were quarantined,

[i]nmates Morris, Mitchener, and Floyd continued to be worried about getting sick, since they were the Pod Workers. All of them continued to do their laundry and cleaning the "4-man-cells" under the impression those new intakes weren't sick.

4

Especially, when Tillman, T. Jones, and Cheeseboro kept saying their "health is fine."

(ECF No. 117 ¶ 12.)

On April 17, 2020, "inmate Floyd began sweating, sneezing, and coughing.  He remained in his cell all day until he left for medical and never returned."  (ECF No. 117 ¶ 13.) Correctional Officer Tillman and a recruit cleaned Floyd's cell with bleach.  (ECF No. 117 ¶ 13.)

On April 18, 2020, the inmates were made to lockdown and were not allowed to use the shower or phone for the next few days.  (ECF No. 117 ¶ 14.)  Correctional staff began wearing medical gowns and masks.  (ECF No. 117 ¶ 14.)  On April 19, 2020, Hardee learned from the television that HRRJ had inmates infected with COVID–19 and was no longer taking new inmates.  (ECF No. 117 ¶ 14.)  Around this time, Hardee and his cellmate Mitchener began exhibiting symptoms consistent with COVID-19.  (ECF No. 117 ¶ 14.)  "One by one other inmates start[ed] being removed for symptoms, and on April 21, 2020, Mitchener [was] removed with a 101.1 temperature."  (ECF No. 117 ¶ 14.)  That night a nurse refused Hardee's request for a health request form and refused to test him for COVID-19.  (ECF No. 117 ¶ 15.)

On April 22, 2020, Nurse Topham and four other nurses informed the inmates in Hardee's pod that they were under quarantine.  (ECF No. 117 ¶ 15.)  Hardee told Nurse Topham that his cellmate had been removed, that he had headaches and diarrhea, and asked to be tested. (ECF No. 117 ¶ 15.)  Nurse Topham took Hardee's temperature, informed him it was normal, and told him to drink lots of water.  (ECF No. 117 ¶ 15.)  Hardee was angry, asked for a grievance, but Nurse Topham just walked away.  (ECF No. 117 ¶ 15.)

On April 23, 2020, after Hardee's mother called HRRJ, Hardee was tested for COVID-19.  (ECF No. 117 ¶ 16.)  Hardee was relocated to another pod, pending the result, and was

provided a mask. (ECF No. 117 ¶ 16.) Hardee contends that this reflects "they've had the masks and were only giving them out once sick — not to prevent it." (ECF No. 117 ¶ 16.) On April 24, 2020, Hardee's test for COVID-19 came back positive. (ECF No. 117 ¶ 17.)

In the ensuing days, Hardee "continued to get worse." (ECF No. 117 ¶18.) Hardee contends that he experienced body aches and could not taste his food. (ECF No. 117 ¶ 18.) Additionally, he has suffered from sleepless nights and depression. (ECF No. 117 ¶ 18.) It took fifty days before Hardee had a double negative test for COVID-19. (ECF No. 117 ¶ 18.)

Hardee demands monetary damages and declaratory relief. (ECF No. 117, at 12–14.)

### B.   <u>Grounds for Relief[4]</u>

Claim 1          "Defendants Walz, Cowan, Bhagirath, Cheeseboro, and T. Jones [are] fully responsible as supervisors for exercising deliberate indifference to [Hardee's] health and safety." (ECF No. 117 ¶ 21.)[5]

     (a) "They . . . continued to disregard the substantial risk and harm by choosing to quarantine new intakes in a cell, in the middle of general population, rather than having those individuals 'isolated' elsewhere." (ECF No. 117 ¶ 21.) These actions (i) violated Hardee's constitutional rights under the Fourteenth Amendment[6] and (ii) amounted to negligence under state law. (ECF No. 117 ¶ 21.)

     (b) "They failed to give [Hardee] a mask, or take necessary steps to prevent [Hardee] and others from getting sick and failed to remedy the wrong even after reading our petition and meeting with us in our block." (ECF No. 117 ¶ 21.) The petition had requested a ban on new admissions and for the VDOC

---

[4] The Court acknowledges that some of Hardee's claims overlap. Nevertheless, given that the matter is before the Court on Hardee's Third Amended Complaint, the Court concludes it is better to repeat a claim, rather than possibly omit what Hardee attempted to set forth as a distinct claim.

[5] Claims 1(a) through 1(d) are directed at Defendants Walz, Cowan, Bhagirath, Cheeseboro, and Jones. Claim 1(e) is directed at Defendants Cheeseboro, Jones, Tillman, and Clark.

[6] "No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV, § 1.

to pick up convicted inmates. (ECF No. 117 ¶ 6.) These actions (i) violated Hardee's constitutional rights under the Fourteenth Amendment and (ii) amounted to negligence under state law. (ECF No. 117 ¶ 21.)

(c) "Defendants subjected [Hardee] to extreme and excessive conditions of confinement; depriving me of a shower, access to the phones, razors, and hygiene, and being unable to exercise, allowing [his] muscles to waste away." (ECF No. 117 ¶ 21.) These actions (i) violated Hardee's constitutional rights under the Fourteenth Amendment and (ii) amounted to negligence under state law. (ECF No. 117 ¶ 21.)

(d) Defendants failed to give Hardee "mask until it was too late, while every nurse and officer wore a mask." (ECF No. 117 ¶ 21.) These actions (i) violated Hardee's constitutional rights under the Fourteenth Amendment and (ii) amounted to negligence under state law. (ECF No. 117 ¶ 21.)

(e) "Defendants Cheeseboro and T. Jones, in unison with Tillman, Clark, and other officers [ ] physically bringing and removing the sick new intakes through [Hardee's] living area and allowing them to spread COVID-19." (ECF No. 117 ¶ 21.) These actions (i) violated Hardee's constitutional rights under the Fourteenth Amendment and (ii) amounted to negligence under state law. (ECF No. 117 ¶ 21.)

Claim 2    Harold Clarke and the VDOC could have and should have "ordered the lockdown and further suspension of new intakes" at HRRJ. (ECF No. 117 ¶ 22.) The failure to do so violated (a) Hardee's constitutional rights and (b) amounted to negligence. (ECF No. 117 ¶ 22.)

Claim 3    "CorrectCare Solutions/Well Path, Kathryn Topham, and Jennifer Hodge exercised deliberate indifference to [Hardee's] medical needs, and failing to protect [Hardee] from COVID-19." (ECF No. 117 ¶ 23.)

(a) These Defendants failed to advise HRRJ staff that it was inappropriate to house the new intakes, in quarantine, amongst the general population inmates. (ECF No. 117 ¶ 23.) These actions (i) violated Hardee's rights under the Fourteenth Amendment; (ii) constituted negligence; and, (iii) amounted to medical malpractice. (ECF No. 117 ¶ 23.)

(b) Topham "was unprofessional, and clearly wrong in her diagnosis when she ignored [Hardee's] symptoms." (ECF No. 117 ¶ 23.) These actions: (i) violated Hardee's rights under the Fourteenth Amendment; (ii) constituted negligence; and (iii) amounted to medical malpractice. (ECF No. 117 ¶ 23.)

(c) Hodge also ignored Hardee's symptoms and on May 6, 2020 wrongly told Hardee that he was negative when he still was positive for COVID-19. (ECF

No. 117 ¶ 23.)  These actions (i) violated Hardee's rights under the Fourteenth Amendment; (ii) constituted negligence; and, (iii) amounted to medical malpractice.  (ECF No. 117 ¶ 23.)

Claim 4       "[A]ll defendants failed to adequately screen incoming new intakes."  (ECF No. 117 ¶ 23.)  This lack of action (a) violated Hardee's rights under the Fourteenth Amendment and (b) amounted to negligence under state law.  (ECF No. 117 ¶ 23.)

## II.  The Motion to Dismiss

### A.     Standard for a Motion to Dismiss

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)).  In considering a motion to dismiss for failure to state a claim, the Court takes a plaintiff's well-pleaded allegations as true and views the complaint in the light most favorable to the plaintiff.  *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993); *see also Martin*, 980 F.2d at 952.  This principle applies only to factual allegations, however, and "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

The Federal Rules of Civil Procedure "require[] only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (second alteration in original) (citation omitted).  Plaintiffs cannot satisfy this standard with complaints containing only "labels and conclusions" or a "formulaic

8

recitation of the elements of a cause of action." *Id.* (citations omitted). Instead, a plaintiff must

allege facts sufficient "to raise a right to relief above the speculative level," *id.* (citation omitted),

stating a claim that is "plausible on its face," *id.* at 570, rather than merely "conceivable." *Id.*

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556

U.S. at 678 (citing *Bell Atl. Corp.*, 550 U.S. at 556). In order for a claim or complaint to survive

dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to state all the

elements of [his or] her claim." *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th

Cir. 2003) (citing *Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 (4th Cir. 2002); *Iodice v.

United States*, 289 F.3d 270, 281 (4th Cir. 2002)). Lastly, while the Court liberally construes *pro

se* complaints, *Gordon v. Leeke,* 574 F.2d 1147, 1151 (4th Cir. 1978), it will not act as the

inmate's advocate and develop, *sua sponte*, statutory and constitutional claims that the inmate

failed to clearly raise on the face of his complaint. *See Brock v. Carroll*, 107 F.3d 241, 243 (4th

Cir. 1997) (Luttig, J., concurring) (indicating an unwillingness to "require[e] district courts to

assume the role of advocate for a *pro se* plaintiff" by addressing unraised issues); *Beaudett v.

City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985).

**B.    Analysis**

**1.    VDOC Is Not a Person**

In order to state a viable claim under 42 U.S.C. § 1983, a plaintiff must allege that a

person acting under color of state law deprived him or her of a constitutional right or of a right

conferred by a law of the United States. *See Dowe v. Total Action Against Poverty in Roanoke

Valley*, 145 F.3d 653, 658 (4th Cir. 1998). Neither "inanimate objects such as buildings,

facilities, and grounds" nor collective terms such as "staff" or "agency," are persons amenable to

9

suit under § 1983. *Lamb v. Library People Them*, No. 3:13-8-CMC-BHH, 2013 WL 526887, at

*2 (D.S.C. Jan. 22, 2013) (citations omitted) (internal quotations omitted) (explaining the

plaintiff's "use of the collective term 'people them' as a means to name a defendant in a § 1983

claim does not adequately name a 'person'"); *Preval v. Reno*, No. 99–6950, 2000 WL 20591, at

*1 (4th Cir. 2000) (citations omitted) (affirming district court's determination that Piedmont

Regional Jail is not a "person" under § 1983). The VDOC is not a person for purposes of 42

U.S.C. § 1983. Accordingly, Claims 2(a) and 4(a) against the VDOC will be DISMISSED

WITH PREJUDICE.

### 2.    <u>Defendant Clarke Is Not Personally Involved</u>

"[A] plaintiff must plead that each Government-official defendant, through the official's

own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. Accordingly, the

plaintiff must allege facts that affirmatively show "that the official charged acted personally in

the deprivation of the plaintiff[']s rights." *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977).

Here, Hardee faults Defendant Clarke for failing to order HRRJ to lockdown, stop taking in new

inmates (Claim 2(a)) and to adequately screen all newly arriving inmates at HRRJ (Claim 4(a)).

"[U]nder Virginia law, the sheriff of the locality is responsible for the care of inmates in his

custody and does not depend on any state official for that authority." *Saunders v. Bell*,

No. 7:21CV00095, 2021 WL 4893356, at *2 (W.D. Va. Oct. 20, 2021). Hardee's Third

Amended Complaint fails to state facts that plausibly indicate that Defendant Clarke could halt

the intake of new inmates at HRRJ or was responsible "for living conditions at [HRRJ]." *Id.*

(dismissing similar claims by an inmate at regional jail against Defendant Clarke). As a pretrial

detainee in a regional jail, Hardee did not enjoy a "constitutional right for state officials to

respond to his letters or to grievances he raises therein." *Id.* Accordingly, Claims 2(a) and 4(a) against Defendant Clarke will be DISMISSED WITH PREJUDICE.

Because the Court ultimately dismisses all of Hardee's federal claims, *see* Part V, it declines to exercise supplemental jurisdiction over his state law claims. *See Spanos v. Vick*, 576 F. Supp. 3d 361, 369–70 (E.D. Va. 2021). Accordingly, Claims 2(b) and 4(b) against Defendants Clarke and the VDOC will be DISMISSED WITHOUT PREJUDICE. The Motion to Dismiss (ECF No. 118) will be GRANTED.

### III. Motions for Summary Judgment

#### A.   Standard for Summary Judgment

Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the responsibility of informing the Court of the basis for the motion and identifying the parts of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation marks omitted). When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting former Fed. R. Civ. P. 56(c), (e) (1986)).

In reviewing a summary judgment motion, the Court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835

11

(4th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). A mere "*scintilla* of evidence," however, will not preclude summary judgment. *Anderson*, 477 U.S. at 251 (quoting *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448 (1872)). "[T]here is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party . . . upon whom the onus of proof is imposed." *Id.* (quoting *Munson*, 81 U.S. at 448). The Court is tasked with assessing whether Hardee "has proffered sufficient proof, in the form of *admissible* evidence, that could carry the burden of proof of his claim at trial." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993) (emphasis added).

Defendants have submitted a host of affidavits and other documents that the Court refers to by their CM/ECF designation. Similarly, Hardee has submitted numerous affidavits, declarations, and other documents in opposition to the Motions for Summary Judgment that the Court refers to by their CM/ECF designation. As explained, many of Hardee's affidavits and sworn statements fail to constitute admissible evidence.

**B.**   **Deficiencies with Respect to Some of Hardee's Proffered Evidence**

The facts offered by an affidavit or sworn declaration must be in the form of admissible evidence. *See* Fed. R. Civ. P. 56(c)(4). The sworn statement "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." *Id.* At the conclusion of a number of his submissions, Hardee has included a verification he labels as "Affidavit of John T. Hardee." (*See, e.g.*, ECF No. 137, at 6.) In that verification, Hardee states: "I, John T. Hardee, the Plaintiff in this matter, swear to these facts as true, pursuant to Fed. R. Civ. P. 56(c)(4), and are made on personal knowledge. I am competent to testify on these matters stated. As usual, I cannot have

pencil notarized." (ECF No. 137, at 6.)[7]  Verifications of this ilk fail to transform the documents into admissible evidence.  The Court previously explained to Hardee:

> An affidavit is a sworn statement of facts made on personal knowledge, and affidavits may be submitted by Plaintiff or any other witnesses. There are two alternative ways to submit an affidavit to the Court, one of which must be followed. One way is for the person making the affidavit to sign the affidavit and swear to the truth before a notary public. The other way, which does not require a notary public, is for the person making the affidavit to sign the affidavit and certify *that he signs under penalty of perjury* and understands that he may be prosecuted if the facts he sets forth are untrue.

(ECF No. 140, at 2 n.1 (emphasis added).)[8]  Accordingly, Hardee's submissions bearing the sort of verification described above, but not explicitly sworn to under penalty of perjury, will not be considered in determining the Motions for Summary Judgment. *See Crockett v. Clarke*, No. 3:18CV139, 2019 WL 1367741, at *26 (E.D. Va. Mar. 26, 2019) (refusing to consider documents verified in such a manner as to avoid the penalty of perjury (citing *Price v. Rochford*, 947 F.2d 829, 832 (7th Cir. 1991))), *aff'd*, 35 F.4th 231 (4th Cir. 2022).

Hardee also attempts to transform his Memoranda into evidence.  This he cannot do.  For example, at the conclusion of Hardee's June 29, 2023 "Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment," Hardee attaches an "Affidavit" wherein he states:

> I, John T. Hardee, Plaintiff is this civil action, swear to these facts, as statements being made on personal knowledge, and pursuant to Fed. R. Civ. P. 56(c)(4), these statements are made under penalty of perjury.  I am competent to testify on the matters state herein.

---

[7] The verifications in Hardee's other "Affidavits" are materially similar to the one quoted above. (*See, e.g.*, ECF No. ECF No. 117, at 14; ECF No. 139, at 17.)

[8] Hardee has submitted a number of declarations from himself and other inmates that are properly sworn to under penalty of perjury. (*See, e.g.*, ECF No. 145, at 6; ECF No. 160, at 3; *see also* ECF No. 137-1, at 8; ECF No. 143-8, at 3.)

(ECF No. 158-1, at 1.)  A similar "Affidavit," appears at the conclusion of Hardee's May 22, 2023 Reply Brief in Opposition.  (ECF No. 146, at 5.)  Statements of this sort do not transform Hardee's Memoranda into admissible evidence.[9]  The Court has repeatedly informed Hardee that:

> [T]he Court will not consider as evidence in opposition to any motion for summary judgment a memorandum of law and facts that is sworn to under penalty of perjury. Rather, any verified allegations must be set forth in a separate document titled "Affidavit" or "Sworn Statement," and reflect that the sworn statements of fact are made on personal knowledge and the affiant is competent to testify on the matters stated therein.  *See* Fed. R. Civ. P. 56(c)(4).

(ECF No. 35, at 2; ECF No. 40, at 2.)

Finally, because they must be in the form of admissible evidence, "summary judgment affidavits cannot be conclusory or based upon hearsay." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (internal citations omitted).  The absence of an "affirmative showing of personal knowledge of specific facts" prevents the consideration of such facts in conducting a summary judgment analysis.  *EEOC v. Clay Printing Co.*, 955 F.2d 936, 945 n.9 (4th Cir. 1992) (citation omitted) (internal quotation marks omitted).  Hardee has submitted a number of statements that run afoul of these principles.  For example, Hardee submitted the declaration of Shane Knight.  (ECF No. 143-8.)  In that declaration, Knight attempts to rely on

---

[9] A similar statement appears at the conclusion of Hardee's April 24, 2023 Memorandum of Law–Opposition to Defendants' Motion to Dismiss (ECF No. 139, at 17), and his May 1, 2023 Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (ECF No. 143, at 24).  These statements, however, are not even sworn to under penalty of perjury.

information provided to him by his cell mate.  (ECF No. 143-8, at 1.)[10]  That information is inadmissible hearsay and will not be considered by the Court.

In light of the foregoing submissions and principles, the following facts are established for purposes of the Motion for Summary Judgment.[11]  All reasonable inferences are drawn in favor of Hardee.

### III.  Relevant Facts for the Motions for Summary Judgment

### A.      HRRJ COVID-Plan and Initial Response to the Pandemic

Superintendent Walz and HRRJ staff "devised a COVID-19 Plan in March 2020 as the pandemic hit.  Through the plan, HRRJ sought to comply with evolving CDC guidelines for testing and quarantine and how to address community spread.  HRRJ also had to maneuver the lack of availability of PPE for non-medical individuals."  (ECF No. 149-1, ¶ 3.)[12]  On March 13, 2020, HRRJ adopted "the *Pandemic COVID-19 Continuity of Operations Plan for Hampton Roads Regional Jail* ('COVID Plan') and "took a multitude of precautions to protect the welfare of inmates, staff, contractors, and civilians."  (ECF No. 149-1, ¶ 4.)

---

[10] Knight relates that his new cellmate, Clarence Gaylord, "went on to say when he came over from his jail that he had a temperature and that the jail thought I was sick."  (ECF No. 143-8, at 1.)

[11] Hardee makes a number of references to his request for video footage from his housing unit.  (*See, e.g.*, ECF Nos. 143, at 2; ECF No. 158, at 4.)  Hardee filed Subpoenas to Appear and Testify at a Hearing or Trial in a Civil Action in conjunction with his faulty, initial class action complaint.  (*See* ECF No. 1-4.)  By Memorandum Order entered on October 16, 2020, the Court informed Hardee that the Court would not consider requests, like his requests for subpoenas, submitted prior to his payment of the filing fee or the grant of leave to leave to proceed *in forma pauperis*.  (ECF No. 5, at 2.)  Hardee never resubmitted a proper request for subpoenas.  Nor did he pursue a proper discovery request for any video footage.

[12] For those Defendants who have submitted an Affidavit and a Supplemental Affidavit, the Court includes a page number before providing the citation to the specific paragraph of the Supplemental Affidavit.

"In accordance with the COVID Plan," HRRJ took the following actions "during the remainder of 2020 and beyond:"

- All personnel entering the facility filled out a CDC questionnaire and had their temperatures taken prior to entering.
- All visitors, professional or otherwise filled out the questionnaire and had their temperatures [taken] prior to entering.
- All personnel, including contracted staff on a daily basis had their temperature taken prior to entering.
- Anyone who had a temperature of (99.8 or higher) was not allowed to enter to include employees, contractors, or professional visitors.
- The jurisdictions that were currently sending inmates agreed to hold inmates at their facility for 14 days prior to transferring them to HRRJ. Once they arrived, they were quarantined (locked down) for an additional 72 hours prior to being classified as a precaution.
- Any inmates coming back from the state hospital were automatically quarantined (locked down) for 14 days.
- Before picking up any new admits the transportation officers were having the inmate's temperatures taken at the jurisdictions.
- Once the inmates arrived at HRRJ they were screened again using the CDC questionnaire and had their temperatures taken as part of the intake process. Again, as a precautionary measure they were quarantined (locked down) for an additional 72 hours.
- All inmates leaving the facility and returning were screened and had their temperature taken.
- All on site visitation for family and friends was cancelled effective 3/13/2020.
- Video arraignment was implemented and all jurisdictions were using this to cut down on transportation of inmates.
- HRRJ partnered with Securus and they agreed to give the inmates one free video visit per inmate per week.
- HRRJ partnered with Securus and they agreed to give Attorneys free video visits so they could maintain contact with their clients.
- Any inmates that displayed flu like symptoms were separated from population and given a flu test.
- If the need arose, HRRJ had four negative pressure rooms[13] that could be used to quarantine individuals.
- Educational material was posted in the facility for staff and inmates.

---

[13] Negative pressure rooms, also known as isolation rooms, are a type of room used in a hospital or medical facility to isolate patients with contagious, airborne diseases. The rooms have lower air pressure than the air pressure outside the room. This means that when the door is opened, potentially contaminated air from inside the room will not flow outside to non-contaminated areas.

- HRRJ staff constantly cleaned, washed hands, and used hand sanitizer. Cleaning materials were provided on a daily basis.
- Civilian staff that could work remotely were authorized to do so.
- HRRJ ordered additional Personal Protective Equipment (PPE), gloves, masks, gowns, thermometers, and cleaning equipment.
- HRRJ partnered with Office of Emergency Management and placed an order for PPE through FEMA.
- Staff was required to review the COVID-19 plan.
- A video was developed and played for the inmates daily at 0900 and 2100 to educate the inmates on how to prevent the spread of COVID.
- All inmates were issued masks and are required to wear them at all times.[14]
- All staff have been issued masks and are required to wear them.
- HRRJ worked with the jurisdictions, courts, prosecutors, and public defenders to get nonviolent offenders and offenders with medical issues released.
- Transportation Officers were issued PPE. The vehicles are cleaned and sanitized after use.
- Masks were required for the inmate and officers transporting inmates to medical appointments, ER runs, [Transportation Duty Officers] TDO's.
- Once individuals started to display COVID-like symptoms, jail administrators designated a COVID pod with one side as positive and the other side as quarantine.
- All officers assigned to the COVID-19 Pod were issued full PPE while inside the pods.
- The entire facility was placed on lockdown effective April 24, 2020 to ensure social distancing.
- The Nurse Practitioner went to the COVID-19 pods Monday through Friday and [assessed] the needs of the individuals and provide[d] care.
- The Mental Health staff provided services for the COVID pods weekly.
- HRRJ started receiving inmates from the four jurisdictions on May 22, 2020. All new admits were being quarantined for 14 days.
- For a while, HRRJ remained on a modified lockdown with a limited number of inmates out at a time. The inmates were required to wear their masks while in the dayroom area, outside of their cells.
- HRRJ coordinated with the local Community Services Boards so that they could video conference their clients in the facility.

(ECF No. 149-1, ¶ 5.)

---

[14] The record reflects that there were insufficient masks for all inmates until May 16, 2020. (ECF No. 134-1, at 7, ¶ 8.)

Superintendent Walz further explains that:

> Pursuant to the HRRJ COVID Plan, inmates coming into HRRJ were not assigned to the general population until they underwent all screening and quarantine protocols. HRRJ does not admit inmates directly; rather, they are transferred from the jail's participating jurisdictions. In early April 2020, at the start of the pandemic, the participating jurisdictions quarantined all newly admitted inmates for 14 days prior to their transfer to HRRJ and the plan called for an additional 72 hours' quarantine time at HRRJ.

(ECF No. 149-1, ¶ 7.)

## B.    Hardee's Petition and the Quarantining New Intakes on His Pod

On or about March 24, 2020, Hardee circulated a petition to inmates at HRRJ, complaining about the staff's response to the pandemic. (ECF No. 143-4, at 1–2.)

In the beginning of April of 2020, HRRJ staff moved Hardee from Unit 2, Floor 1, Pod 1B, Cell 109, to Unit 2, Floor 1, Pod 1B, Cell 104. (ECF No. 134-6, at 2). After Hardee and his cellmates exited their cell, Sergeant Cheeseboro and Officer Clark escorted four inmates in red jumpsuits and placed them in the cell Hardee had left. (ECF No. 143-5, at 3.) These individuals were "new intake inmates." (ECF No. 143-5, at 3.)

However, pod officers such as Sergeant Cheeseboro, "only brought newly admitted inmates into the general population, after they were subject to HRRJ's quarantine protocol, were cleared by medical, and assigned by classification to a general population pod." (ECF No. 134-2, at 3, ¶ 5.) Therefore, these new intakes had been quarantined at their previous jail for fourteen (14) days prior to arriving at HRRJ. (ECF No. 149-1 ¶ 7.) Per the HRRJ plan, these new intakes had their temperature taken before being picked up by transportation officers, and again upon arriving at HRRJ. (ECF No. 149-1 ¶ 5.) Additionally, they were screened at HRRJ using a questionnaire approved by the CDC. (ECF No. 149-1 ¶ 5.) The new intakes were then locked down in their cells for an additional three days upon arriving at HRRJ. (ECF No. 149-1 ¶ 5.)

18

The new intakes told the other inmates they were under medical observation.[15]  (ECF No. 143-6, at 2.)  Nurses came and checked the temperature of the new intakes. (ECF No. 137-1, at 3.)  "[O]ver the next few weeks . . . when a few would leave . . . more red suits would fill the cells over and over." (ECF No. 143-6, at 2.)  As pertinent here, Sergeant Cheeseboro, Officers Clark, and Tillman were the staff bringing the new intakes into the pod. (ECF No. 143-6, at 2.) These officers swear they only brought newly admitted inmates into the general population after they were subject to HRRJ's quarantine protocol and were cleared by medical. (ECF No. 134-2, at 3, ¶ 5; ECF No. 134-3, at 3, ¶ 6; ECF No. 134-4, at 3, ¶ 5.)  Corey Mitchener, Hardee's cellmate, was a pod worker and cleaned out the quarantine cells in between shifts of new intakes. (ECF No. 145, at 4.)

HRRJ has four negative pressure cells.  (ECF No. 149-5, at 6, ¶ 4.)[16]  In April of 2020, HRRJ had population of approximately 800 inmates.  (ECF No. 149-5, at 6, ¶ 4.)

In early April of 2020, Superintendent Walz, Assistant Superintendent Cowan, and Captain Bhagirath met with Hardee. (ECF No. 149-1, ¶ 6.)  Hardee was upset because he had heard a news report that inmates were being screened before coming into HRRJ and Hardee did not think that was so. (ECF No. 149-1, ¶ 6.)  Hardee,

> however, labored under the misunderstanding that screening was the same thing as testing.  In early April 2020, anyone who left and returned to the jail, such as for a court date, was screened with a temperature check.  At that time, just weeks into

---

[15] On April 3, 2020, Hardee was moved to Unit 2, Floor 1, Pod1B, Cell 210.  (ECF No. 134-6, at 2.)

[16] The page has two paragraphs numbered "4".  The Court references the second paragraph numbered 4.

> the pandemic, testing was only available in the jail, as in the greater community, for those with COVID symptoms.

(ECF No. 149-1, ¶ 6.)

On April 9, 2020, Captain Bhagirath and Assistant Superintendent Cowan came to speak with the inmates in Hardee's pod. (ECF No. 143-5, at 4.) They explained to the inmates "that they were going to do all they could to prevent the virus from entering our facility." (ECF No. 143-5, at 4.)

> In early April 2020, Captain Bhagirath
>
> established a modified lockdown schedule throughout the housing units. The purpose of the modified lockdown schedule was to promote social distancing in the pods by reducing the number of inmates in the day room and to give the inmates equal amount of time in the day room. The schedule was for pods that at the time were not on quarantine, but was subject to change at any time, particularly as the positive cases increased in the facility. The lockdowns were set up in a way to allow inmates approximately 4 hours a day out of their cells in the day room. In addition, on temporary lockdown, inmates were permitted to shower three times a week, were offered razors three times a week, and each cell has a sink with running water and a toilet.

(ECF No. 134-1, at 7, ¶ 9.)

## C.    The Outbreak of COVID-19 at HRRJ and Hardee's Infection

> The first case of COVID-19 was detected at HRRJ
>
> in mid-April 2020, when an inmate tested positive. Within days, several other inmates tested positive as did several staff members. Once there were multiple cases, HRRJ could not isolate all inmates who tested positive in the four negative pressure cells. Jail administrators designated a COVID pod with one side as positive and one side as quarantine. Jail administrators did not know how the virus got in, but redoubled efforts to keep staff and inmates safe . . . .

(ECF No. 149-1 ¶ 8.) Captain Bhagirath was hospitalized from April 13 through April 18, 2020 with COVID and was on sick leave for weeks thereafter. (ECF No. 149-5, at 8, ¶ 11.)

On or about April 20, 2020, Hardee's cellmate, Mitchner, was removed from the cell because he was running a slight temperature. (ECF No. 137-1, at 6.) Hardee began yelling because the nurses were refusing to test him. (ECF No. 137-1, at 6.) Nurse Topham explains that if Hardee did not have a fever, which is what he alleges, she would not have been able to test him for COVID-19 unless and until his cellmate tested positive for COVID-19. (ECF No. 129-1, ¶ 4.) During her interactions with Hardee, "he was not in any medical distress and was not reporting or showing serious COVID-19 symptoms." (ECF No. 129-1 ¶ 5.)

After Mitchner tested positive, per protocol, Hardee was tested for COVID-19. (ECF No. 129-1 ¶ 4.) Although Nurse Topham could not test him at the time she interacted with Hardee, she added some COVID-19 treatment/medications to his medication list, including a multivitamin with folic acid, Gatorade, zinc, and vitamin C. (ECF No. 129-1 ¶ 4.)

On April 23, 2020, Hardee was tested for COVID-19 because his cellmate had tested positive. (ECF No. 130-1 ¶ 3.) Hardee tested positive for COVID-19. (ECF No. 130-1 ¶ 3.) Hardee was repeatedly tested for COVID-19 in the ensuing weeks and tested positive three more times. (ECF No. 130-1 ¶ 3.) Hardee finally tested negative for COVID-19 on May 27, 2020 and again on June 5, 2020. (ECF No. 130-1 ¶ 3.) "Hardee was placed on quarantine status between April 23, 2020 and June 5, 2020 because he had tested positive for COVID-19 . . . ." (ECF No. 130-1 ¶ 4.)

Hardee's "COVID-19 symptoms were mild and intermittent, and the medical staff addressed them with monitoring and medication that was available to him as needed." (ECF No. 130-1 ¶ 5.) "Hardee was told he would be observed, and that medication was available to treat any symptom of fever, cough, nausea, pain, and flu-like symptoms, that oxygen was available if needed, and that they could monitor his oxygen level, temperature and heart rate." (ECF No.

130-1 ¶ 6.) There was a standing order offering Hardee specific medications for his cough, diarrhea, and headache if he needed and wanted them. (ECF No. 130-1 ¶ 7.) Hardee was regularly seen by medical staff during the period he was positive for COVID-19. (ECF No. 130-1 ¶ 8.) During this period, he "fluctuated between being asymptomatic and having mild symptoms. He never reported or was observed to have any serious or severe symptoms of COVID-19." (ECF No. 130-1 ¶ 9.)

Nurse Practitioner ("NP") Hodge saw Hardee on May 1, 2020. (ECF No. 130-1 ¶ 10.) She "assessed his neuro, heart, lungs, head, eyes, ears, nose, throat, and skin and found them to be normal." (ECF No. 130-1 ¶ 10.) "Hardee reported having a headache, sore throat, and diarrhea, but reported improvement in his symptoms." (ECF No. 130-1 ¶ 10.)

NP Hodge denies seeing Hardee on May 6, 2020 and swears that she did not erroneously tell Hardee that he was negative for COVID-19.[17] (ECF No. 130-1 ¶ 12.) On May 8, 2020, NP Hodge examined Hardee and asked if his symptoms were being adequately managed. (ECF No. 130-1 ¶ 13.) Hardee stated he was "'fluctuating between very mild symptoms and/or being asymptomatic' and the medications offered to him were sufficient when the symptoms occurred." (ECF No. 130-1 ¶ 13.) On May 15, 2020, NP Hodge again examined Hardee. (ECF No. 130-1 ¶ 14.) "Hardee reported that he had mild symptoms on occasion, but had been 'mostly asymptomatic.'" (ECF No. 130-1 ¶ 14.) NP Hodge found Hardee's neuro, heart, lungs, head, eyes, ears, nose, throat, and skin to be normal. (ECF No. 130-1 ¶ 14.)

---

[17] Medical records show that Hardee was evaluated on May 6, 2020 by a different medical provider and that Hardee was COVID-19 positive. (*See* ECF 130-2, at 24–25.) Even if NP Hodge (or someone else) erroneously informed Hardee on May 6, 2020 that he was negative for COVID-19, this fact would be immaterial and insufficient to overcome Summary Judgment.

On May 22, 2020, Hardee was seen by medical staff because he complained that he was short of breath and coughing. (ECF No. 130-1 ¶ 15.)  Hardee was assessed and his lungs were clear and he was not in distress. (ECF No. 130-1 ¶ 15.)  NP Hodge agreed with medical staff to provide Hardee Mucinex for his cough. (ECF No. 130-1 ¶ 15.)  According to NP Hodge, Hardee "never reported any severe or serious COVID-19 symptoms, and his mild, infrequent symptoms were treated appropriately." (ECF No. 130-1 ¶ 17.)  In her interactions with Hardee, "he was never in any medical distress or reporting or showing serious COVID-19 symptoms.  He only reported mild symptoms or no symptoms at all." (ECF No. 130-1 ¶ 17.)

### D.   Changes in HRRJ Response to COVID-19 after the Introduction of COVID-19

After inmates and staff became sick, HRRJ increased "the quarantine time for newly admitted inmates from 72 hours up to 14 days," purchased masks from the VDOC, which had begun to have inmates manufacture masks. (ECF No. 149-1 ¶ 8.)  Specifically, on May 16, 2020, HRRJ received sufficient masks from the VDOC and staff immediately began distributing two masks to each inmate. (ECF No. 134-1, at 7, ¶ 8.)  "HRRJ also kept newly admitted inmates separate while quarantining, in cells behind a steel door separating them from other cells, and with a ventilation system that went to the outside and did not recirculate air." (ECF No. 149-1, ¶ 8.)

### IV.  Analysis

With respect to the claims presently before the Court, because Hardee was a "'pretrial detainee and not a convicted prisoner,' the Fourteenth Amendment, and not the Eighth Amendment, governs his claim[s]." *Mays v. Sprinkle*, 992 F.3d 295, 300 (4th Cir. 2021) (quoting *Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir. 1988)).  "[A] pretrial detainee has a right

23

under the Due Process Clause to be free from punishment before his guilt is adjudicated." *Tate v. Parks*, 791 F. App'x 387, 390 (4th Cir. 2019) (citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)). However, in the context, of inadequate medical care or conditions posing a risk to a detainee's health, to survive a motion for summary judgment under either the Eighth Amendment or Fourteenth Amendment, a plaintiff must demonstrate that the defendant acted with deliberate indifference. *Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001) ("[W]e need not resolve whether Brown was a pretrial detainee or a convicted prisoner because the standard in either case is the same—that is, whether a government official has been 'deliberately indifferent to any [of his] serious medical needs.'" (second alteration in original) (quoting *Belcher v. Oliver*, 898 F.2d 32, 34 (4th Cir. 1990)));[18] *see also Tarashuk v. Givens*, 53 F.4th 154, 163 (4th Cir. 2022).

"The test for deliberate indifference is two-pronged and includes both objective and subjective elements." *Stevens v. Holler*, 68 F.4th 921, 931 (4th Cir. 2023) (citing *Mays*, 992 F.3d at 299). A plaintiff must demonstrate that (1) he or she "was exposed to a substantial risk of serious harm (the objective prong); and (2) the prison official knew of and disregarded that

---

[18] The Supreme Court of the United States has held that, for a pretrial detainee to establish an excessive force claim under the Fourteenth Amendment, they need not show that the officer was subjectively aware that the use of force was excessive; rather, they need only show that the force purposely, knowingly, or recklessly used against them was objectively unreasonable. *Kingsley v. Hendrickson*, 576 U.S. 389 (2015). However, *Kingsley* did not address whether this standard applies to other claims brought by pretrial detainees pursuant to the Fourteenth Amendment, and, to date, the United States Court of Appeals for the Fourth Circuit has not considered this issue. *See Mays*, 992 F.3d at 301–02 n.4 (noting that the Fourth Circuit has yet to address whether *Kingsley* applies to other deliberate indifference claims by pretrial detainees and collecting other circuit court of appeals cases that are split on the issue); *Sams v. Armor Corr. Health Servs., Inc.*, No. 3:19CV639, 2020 WL 5835310, at *19 n.19 (E.D. Va. Sept. 30, 2020) (noting that "absent a Fourth Circuit decision applying *Kingsley* to medical deliberate indifference claims, the Court will continue to apply well-settled Fourth Circuit precedent on this matter.").

substantial risk to the inmate's health or safety (the subjective prong)." *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 837–38 (1994); *see Westmoreland v. Brown*, 883 F. Supp. 67, 72 (E.D. Va. 1995) (observing "punishment, whether for a convicted inmate or a pretrial detainee, is the product of intentional action, or intentional inaction, respecting known and substantial risks of harm." (citing *Farmer*, 511 U.S. at 837–38).

"Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976)). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. *Farmer* teaches "that general knowledge of facts creating a substantial risk of harm is not enough. The prison official must also draw the inference between those general facts and the specific risk of harm confronting the inmate." *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (citing *Farmer*, 511 U.S. at 837). Thus, to survive a motion for summary judgment under the deliberate indifference standard, a plaintiff "must show that the official in question subjectively recognized a substantial risk of harm . . . [and] that the official in question subjectively recognized that his actions were 'inappropriate in light of that risk.'" *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (quoting *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997)).

"Importantly, a prison official 'who actually [knows] of a substantial risk to inmate health or safety may be found free from liability if [he] responded reasonably to the risk, even if the harm ultimately was not averted.'" *Short v. Smoot*, 436 F.3d 422, 427 (4th Cir. 2006) (alterations in original) (quoting *Farmer*, 511 U.S. at 844). Therefore, when "addressing the subjective prong, [t]he key inquiry is whether the [defendants] responded reasonably to . . . the

risk posed by COVID-19." *Medina v. Williams*, No. 21–1350, 2022 WL 2714517, at *2 (10th

Cir. July 13, 2022) (alterations in original) (omission in original) (quoting *Wilson v. Williams*,

961 F.3d 829, 840–41 (6th Cir. 2020)).  Furthermore, "[a] response may be reasonable even if

'the harm imposed by COVID-19 on inmates . . . ultimately is not averted.'" *Id.* (quoting

*Wilson*, 961 F.3d at 841).

A.   <u>**Claims Pertaining to New Intakes**</u>

In Claim 1(a)(i) and 1(b)(i), Hardee contends that Defendants Walz, Cowan, Bhagirath,

Cheeseboro, and T. Jones acted with deliberate indifference "by choosing to quarantine new

intakes in a cell, in the middle of general population, rather than having those individuals

'isolated' elsewhere." (ECF No. 117 ¶ 21.)[19]  Relatedly, in Claim 1(e)(i), Hardee contends that

Defendants Cheeseboro, T. Jones, Tillman, and Clark acted with deliberate indifference by

"physically bringing and removing the sick new intakes through [Hardee's] living area and

---

[19] In Claim 1(b)(i) and Claim 1(d)(i) Hardee also contends that Defendants Walz, Cowan,
Bhagirath, Cheeseboro, and T. Jones acted with deliberate indifference by failing to provide him
with a mask to prevent him from becoming infected.  The record, however, reflects that there
were not enough masks for all the inmates in HRRJ at the time Hardee became infected.
Defendants promptly provided two masks to every inmate once they received a sufficient
quantity of masks.  This record does not establish deliberate indifference.

> That prison officials did not require face masks for the first few months of
> the pandemic does not establish deliberate indifference. . . .  At first, it was unclear
> whether cloth face masks would be particularly effective in curbing the spread of
> the virus. Of course, we now know that such masks do help reduce the risk of
> transmission. But it was not unreasonable for prison officials to refrain from
> requiring face masks in the early months of the pandemic, particularly when access
> to such masks was limited.

*Snyder v. Bergeron*, No. CV 20-2158, 2021 WL 784813, at *4 (E.D. La. Jan. 21, 2021) (quoting
*Kesling v. Tewalt*, Case No. 1:20-cv-00334, 2020 WL 4496495, at *6 (D. Idaho Aug. 4, 2020)),
*report and recommendation adopted*, No. CV 20-2158, 2021 WL 780751 (E.D. La. Mar. 1,
2021).  Accordingly, this aspect of Claim 1(b)(i) and Claim 1(d)(i) will be DISMISSED WITH
PREJUDICE.

allowing them to spread COVID-19." (ECF No. 117 ¶ 21.) Finally, in Claim 4(a), Hardee contends that "all defendants [acted with deliberate indifference because they] failed to adequately screen incoming new intakes." (ECF No. 117 ¶ 21.)

HRRJ took an abundance of actions to reduce the risk of the introduction of and transmission of COVID-19 at HRRJ. With respect to new intakes, HRRJ required that these individuals be quarantined at the local feeder jails for fourteen (14) days before being transferred to HRRJ. Furthermore, after that initial quarantine period, before an inmate could be moved to HRRJ, the inmate would have his or her temperature checked by the transportation officer before he or she could be moved to HRRJ. Upon arriving at HRRJ, the new intakes were screened again using the CDC questionnaire, had their temperatures taken, and were cleared by medical personnel. Any individual who had a temperature was not allowed to enter HRRJ. Thereafter, the new intakes were locked down in their cells under medical observation for an additional three days before they were allowed to interact with the general population inmates.

With respect Defendants Cheeseboro, Clark, Tillman, and Jones, they only moved intakes into these quarantine cells after being assured by the medical department that they were following HRRJ's COVID-19 protocol and the intakes were not experiencing COVID-19 symptoms. *See Iko v. Shreve*, 535 F.3d 225, 242 (4th Cir. 2008) (observing that correctional officers "can generally rely on his medical staff's examinations" and diagnoses). There is no evidence that these Defendants ever knowingly placed a sick new intake in Hardee's pod. To the extent that a new intake became sick after admission to HRRJ and was removed from Hardee's housing unit by these Defendants, such action is consistent with concern for Hardee's health and safety, rather than deliberate indifference.

27

Because Hardee fails to demonstrate deliberate indifference by Defendants Cheeseboro, Clark, Tillman and Jones, Claims 1(a)(i), 1(b)(i) and 1(e)(i) against them will be DISMISSED WITH PREJUDICE. Furthermore, on this record, Hardee fails to demonstrate that any Defendant acted with deliberate indifference with respect to the general screening process of new intakes for COVID-19. Accordingly, Claim 4(a) will be DISMISSED WITH PREJUDICE.

What remains is that aspect of Claims 1(a)(i) and 1(b)(i) against Defendants Walz, Cowan, and Bhagirath wherein Hardee insists these Defendants acted with deliberate indifference because they quarantined (lockdown) the new intakes in his pod. While perhaps not the absolute best course of action with the benefit of hindsight and what we now regarding the spread of Covid-19, Hardee fails to demonstrate these Defendants acted with deliberate indifference.[20] The Fourth Circuit has emphasized "the feasibility of additional precautionary measures is rarely probative in a deliberate indifference inquiry." *Parrish ex rel. Lee*, 372 F.3d at 309 (citing *Brown*, 240 F.3d at 390–91). "[T]he question in deliberate indifference cases is not whether the officials could have taken additional precautions—almost invariably, with the benefit of 20/20 hindsight, there are additional precautions that could have been taken—but whether they '*disregard[ed]* an excessive risk to . . . health or safety.'" *Id.* (alterations in original) (omission in original) (citing *Brown*, 240 F.3d at 390–91; *Grayson*, 195 F.3d at 695); *see Lewis v. Richards*, 107 F.3d 549, 553 (7th Cir. 1997) (stating that summary judgment might have been inappropriate under the "deliberate indifference" standard if the defendants had simply refused to do anything).

---

[20] Here, Defendants eventually quarantined new intakes "in cells behind a steel door separating them from other cells, and with a ventilation system that went to the outside and did not recirculate air." (ECF No. 149-1, ¶ 8.)

Here, the new intakes already had been quarantined at their prior facility for fourteen (14) days prior to their transfer to HRRJ. At the time they acted, Defendants had every reason to believe that the additional quarantine with the multiple temperature checks and the medical screening at HRRJ was sufficient to significantly reduce the risk that new intakes could be positive for COVID-19 and transmit it to inmates at HRRJ. Further, the new intakes were not permitted to wander general population, but were locked in their cells for three days after they arrived at HRRJ. "These affirmative steps may or may not be the best possible response to the threat of COVID-19 within the institution [in April of 2020], but they undermine an argument that [defendants] have been actionably deliberately indifferent to the health risks of inmates." *Grinis v. Spaulding*, 459 F. Supp. 3d 289, 292 (D. Mass. 2020); *Ross v. Russell*, No. 7:20-CV-000774, 2022 WL 767093, at *11 (W.D. Va. Mar. 14, 2022) (observing prison officials' measures to combat COVID-19 "indicate that prison officials are trying, very hard, to protect inmates against the virus and to treat those who have contracted it, and belie any suggestion that prison officials have turned the kind of blind eye and deaf ear to a known problem that would indicate deliberate indifference." (quoting *Chunn v. Edge*, 465 F. Supp. 3d 168, 203 (E.D.N.Y. 2020))). Hardee fails to demonstrate that Defendants Walz, Cowan, and Bhagirath acted with deliberate indifference.[21] Accordingly, Claims 1(a)(i) and 1(b)(i) against them will be DISMISSED WITH PREJUDICE.

---

[21] Hardee seeks to hold various Defendants liable under a theory of supervisory liability. (*See, e.g.*, ECF No. 117 ¶ 21.) In order to survive summary judgment, Hardee must establish three elements: (1) the supervisor must have actual or constructive knowledge that his subordinate was engaged in conduct that posed a "persuasive and unreasonable risk" of constitutional injury to citizens like Hardee; (2) the supervisor's response to that knowledge must be so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices"; and (3) there must be an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by Hardee. *See Shaw v. Stroud*, 13 F.3d

Finally, in Claim 3(a)(i) Hardee contends that Defendants CorrectCare Solutions/Well Path, Topham, and Hodge acted with deliberate indifference when they failed to advise HRRJ staff that it was inappropriate to house new intakes, in quarantine, amongst the general population inmates. Hardee, however, failed to adduce any evidence that these Defendants had any role in the determining the how inmates at HRRJ were housed. Both Topham and Hodge swear that in April and May of 2022, they had no role in any decisions regarding the housing and movement of inmates. (ECF No. 129-1, ¶ 2; ECF No. 130-1, ¶ 2.) Further, Hardee fails to allege facts, much less adduce evidence, that reflects the decision on where to house new intakes was product of an official policy or custom of Defendant CorrectCare Solutions/Well Path. *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 728 (4th Cir. 1999) (citations omitted) ("[A] private corporation is liable under § 1983 only when an official policy or custom of the corporation causes the alleged deprivation of federal rights."). Accordingly, Claim 3(a)(i) will be DISMISSED WITH PREJUDICE.

## B.     **Claims of Inadequate Medical Care**

In Claim 3(b)(i), Hardee contends that Nurse Hodge acted with deliberate indifference when, on or about April 20, 2020, she ignored his demand to receive a COVID-19 test and appropriate treatment. "To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citing *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986)). Absent exceptional circumstances, an inmate's disagreement with medical personnel

---

791, 799 (4th Cir. 1984). In no instance has Hardee demonstrated that a Defendant acted with deliberate indifference. Therefore, any claim of supervisory liability fails.

with respect to a course of treatment is insufficient to state a cognizable constitutional claim,
much less to demonstrate deliberate indifference. *See Wright v. Collins*, 766 F.2d 841, 849 (4th
Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir. 1970)). Furthermore, in
evaluating a prisoner's complaint regarding medical care, the Court is mindful that "society does
not expect that prisoners will have unqualified access to health care" or to the medical treatment
of their choosing. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citing *Estelle*, 429 U.S. at
103–04).

Hardee told Nurse Topham that he had headaches and diarrhea and asked to be tested.
Nurse Topham took Hardee's temperature, which was normal. Although Hardee wanted to be
tested, Nurse Topham swears that the then-existing protocols for the limited number of tests
available did not permit testing under these circumstances.[22] Nevertheless, Nurse Topham did
not ignore Hardee's plight. She added some COVID-19 treatment/medications to his medication
list, including a multivitamin with folic acid, Gatorade, zinc, and vitamin C. Under these
circumstances, Hardee fails to demonstrate that, subjectively, Nurse Topham acted with
deliberate indifference.

Furthermore, at most, Nurse Topham's actions merely delayed Hardee's access to a
COVID-19 test and additional medical care for a few days. In the context of delayed medical
care, in order to demonstrate that the deprivation was objectively serious, a plaintiff must also
establish that the delay in the provision of medical care "resulted in substantial harm." *Mata v.
Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quoting *Oxendine v. Kaplan*, 241 F.3d 1272, 1276
(10th Cir. 2001)); *see Webb v. Hamidullah*, 281 F. App'x 159, 165 (4th Cir. 2008). "[T]he

---

[22] The protocols permitted Hardee to be tested once his prior cellmate tested positive.

substantial harm requirement may be satisfied by lifelong handicap, permanent loss, or considerable pain." *Shabazz v. Prison Health Servs., Inc.*, No. 3:10CV190, 2012 WL 442270, at *5 (E.D. Va. Feb. 9, 2012) (quoting *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001)). There is no evidence that Nurse Topham's actions caused Hardee to suffer a "lifelong handicap, permanent loss, or considerable pain." *Id.* (quoting *Garrett*, 254 F.3d at 950). Accordingly, Claim 3(b)(i) will be DISMISSED WITH PREJUDICE.

In Claim 3(c)(i), Hardee contends that on May 6, 2020, NP Hodge acted with deliberate indifference when she ignored his symptoms and wrongly told him he was negative, when he was positive for COVID-19. The evidence reflects NP Hodge did not see Hardee on May 6, 2020, and never incorrectly informed Hardee of his COVID-19 status. Even if someone did, the action is immaterial to summary judgment. Furthermore, there is no evidence that NP Hodge ignored Hardee's symptoms or provided inadequate medical care. Rather, the record reflects that NP Hodge and other medical personnel were attentive to Hardee's needs after he tested positive for COVID-19. Because Hardee fails to demonstrate that NP Hodge acted with deliberate indifference, Claim 3(c)(i) will be DISMISSED WITH PREJUDICE.

## C.    Claims Pertaining to Living Conditions

In Claim 1(c)(i), Hardee contends that Defendants Walz, Cowan, Bhagirath, Cheeseboro, and Jones violated his rights under the Fourteenth Amendment by "depriving me of a shower, access to the phones, razors, and hygiene, and being unable to exercise, allowing [his] muscles to waste away." (ECF No. 117 ¶ 21.) Hardee specifies that he was "not allowed out to shower or use the phone for a few days." (ECF No. 117 ¶ 14.) The record reflects that even inmates on temporary lockdown "were permitted to shower three times a week, were offered razors three times a week, and each cell has a sink with running water and a toilet." (ECF No. 134-1, ¶ 9.)

32

As previously noted, because Hardee was a pretrial detainee, under the Due Process Clause, he enjoys a right to be free from punishment before his guilt is adjudicated. *Tate*, 791 F. App'x at 390 (citing *Bell*, 441 U.S. at 535). A pretrial detainee may bring substantive or procedural due process claims. *Id.* "Typically, a substantive due process claim pursued by a pretrial detainee challenges the general conditions of confinement or the treatment of all detainees in a specific facility." *Williamson v. Stirling*, 912 F.3d 154, 174 (4th Cir. 2018) (citations omitted). "A pretrial detainee challenging individually-imposed restrictions — as opposed to shared conditions of confinement — is entitled to pursue a procedural due process claim." *Id.* (citing *Dilworth v. Adams*, 841 F.3d 246, 250–52 (4th Cir. 2016)).

Here, Claim 1(c)(i), challenges shared conditions, therefore it is substantive due process challenge. The Fourth Circuit has explained that a pretrial detainee pursuing a substantive due process claim may challenge the conditions of confinement

> where they are so disproportionate or arbitrary that they are not related to legitimate penological objectives and amount to punishment. To prevail on such a claim, a detainee must show that the challenged treatment or conditions were either (1) imposed with an express intent to punish, or (2) not reasonably related to a legitimate nonpunitive objective, in which case an intent to punish may be inferred.

*Tate*, 791 F. App'x at 390 (citations omitted). There is no evidence that any of the conditions of which Hardee complains was imposed with an express intent to punish. Rather, all the restrictions imposed were reasonably related to the legitimate nonpunitive objective of preventing the spread of COVID-19 by limiting inmate movement and social interaction. Furthermore, in order to establish a substantive due process violation, Hardee "needs to have suffered more than a de minimis injury." *Robles v. Prince George's Cnty., Maryland*, 302 F.3d 262, 270 (4th Cir. 2002) (citations omitted); *see Bell*, 441 U.S. at 539 & n.21 (citation omitted) (allowing "condition[s] or restriction[s] of pretrial detention" that are "reasonably related to a

33

legitimate governmental objective" or are "'de minimis'" in nature). Hardee has not introduced evidence reflecting that he suffered more than a *de minimis* injury. Accordingly, Claim 1(c)(i) will be DISMISSED WITH PREJUDICE.

### V.  Conclusion

Claims 1(a)(i), 1(b)(i), 1(c)(i), 1(d)(i), 1(e)(i), 2(a), 3(a)(i), 3(b)(i), and 4(a) will be DISMISSED WITH PREJUDICE. The Court has dismissed all of Hardee's constitutional claims. "The doctrine of supplemental jurisdiction indicates that federal courts generally have discretion to retain *or* dismiss state law claims when the federal basis for an action drops away." *Shanaghan v. Cahill*, 58 F.3d 106, 109 (4th Cir. 1995) (citation omitted). "Although a federal court has discretion to assert pendent jurisdiction over state claims even when no federal claims remain certainly if the federal claims are dismissed before trial . . . the state claims should be dismissed without prejudice." *Alexandria Resident Council, Inc. v. Alexandria Redevelopment & Hous. Auth.*, 11 F. App'x 283, 287 (4th Cir. 2001) (citations, alterations, internal quotation marks omitted). The Court declines to exercise supplemental jurisdiction over Hardee's state law. Accordingly, Claims 1(a)(ii), 1(b)(ii), 1(c)(ii), 1(d)(ii), 1(e)(ii), 2(b), 3(a)(ii), 3(a)(iii), 3(b)(ii), 3(b)(iii), 3(c)(ii), 3(c)(iii), and 4(b) will be DISMISSED WITHOUT PREJUDICE.

The Motion to Dismiss (ECF No. 118) will be GRANTED. The Motions for Summary Judgment (ECF Nos. 127, 133, 148) will be GRANTED. The action will be DISMISSED.

An appropriate Final Order will accompany this Memorandum Opinion.


Date: 9-1-2023
Richmond, Virginia

_____  /s/
M. Hannah Lauck
United States District Judge